# United States District Court

### for the
### Western District of New York

United States of America

v.

**LOUIS P. FERRARI II, DOMINIC SPRAGUE, ANTHONY AMATO, JOSEPH LOMBARDO, JEFFREY BOSCARINO, JAMES CIVILETTI, and TOMASSO SESSA,**

Case No. 23-MJ-

## CRIMINAL COMPLAINT

I, Marilyn K. Halliday, Special Agent, Homeland Security Investigations, the complainant in this case, state that the following is true to the best of my knowledge and belief:

Beginning in or before October 2020, through and including on or about April 17, 2021, in the Western District of New York and elsewhere, the defendant **LOUIS P. FERRARI II** violated Title 18, United States Code, Sections 371, 1084, 1955, and 1956, offenses described as follows:

The defendant, **LOUIS P. FERRARI II**, being engaged in the business of betting and wagering, did knowingly use, cause to be used, and conspire to use a wire communication facility to transmit in interstate and foreign commerce—that is, between the State of New York and the State of Florida and between the United States and Costa Rica—bets and wagers and information assisting in the placing of bets and wagers on a sporting event and contest,

All in violation of Title 18, United States Code, Sections 1084 and 371, and

The defendant, **LOUIS P. FERRARI II**, did knowingly conduct, finance, manage, supervise, direct, and own and conspire to conduct, finance, manage, supervise, direct, and own all or part of an illegal gambling business, which gambling business was a violation of the laws of the State of New York—that is, New York Penal Law Sections 225.00, *et seq.*—and which involved five or more persons who conducted, financed, managed, supervised, directed, and owned all or part of said illegal gambling business, and which remained in substantially continuous operation for a period in excess of thirty days and had a gross revenue of $2,000.00 in any single day,

All in violation of Title 18, United States Code, Sections 1955 and 371, and

The defendant, **LOUIS P. FERRARI II**, conducted financial transactions involving property constituting the proceeds of specified unlawful activity—specifically the transmission of wagering information in interstate commerce and the operation of an illegal gambling business—all while knowing that the property involved in the financial transactions was the proceeds of some form of unlawful activities and that the transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities,

All in violation of Title 18, United States Code, Section 1956.

Beginning in or before October 2020, through and including on or about April 17, 2021, in the Western District of New York and elsewhere, the defendant **DOMINIC SPRAGUE** violated Title 18, United States Code, Sections 371, 1084, and 1955, offenses described as follows:

The defendant, **DOMINIC SPRAGUE**, being engaged in the business of betting and wagering, did knowingly use, cause to be used, and conspire to use a wire communication facility to transmit in interstate and foreign commerce—that is, between the State of New York and the State of Florida and between the United States and Costa Rica—bets and wagers and information assisting in the placing of bets and wagers on a sporting event and contest,

All in violation of Title 18, United States Code, Sections 1084 and 371, and

The defendant, **DOMINIC SPRAGUE**, did knowingly conduct, finance, manage, supervise, direct, and own and conspire to conduct, finance, manage, supervise, direct, and own all or part of an illegal gambling business, which gambling business was a violation of the laws of the State of New York—that is New York Penal Law Sections 225.00, *et seq.*—and which involved five or more persons who conducted, financed, managed, supervised, directed, and owned all or part of said illegal gambling business, and which remained in substantially continuous operation for a period in excess of thirty days and had a gross revenue of $2,000.00 in any single day,

All in violation of Title 18, United States Code, Sections 1955 and 371.

Beginning in or before October 2020, through and including on or about April 17, 2021, in the Western District of New York and elsewhere, the defendants **ANTHONY AMATO, JOSEPH LOMBARDO, JEFFREY BOSCARINO,** and **JAMES CIVILETTI**, violated Title 18, United States Code, Section 371, an offense described as follows:

The defendants, **ANTHONY AMATO, JOSEPH LOMBARDO, JEFFREY BOSCARINO,** and **JAMES CIVILETTI**, knowingly and willfully conspired and agreed with each other, **LOUIS P. FERRARI II**, **DOMINIC SPRAGUE**, and others to commit an offense against the United States, that is, to violate Title 18, United States Code, Section 1084 by knowingly using a wire communication facility to transmit in interstate and foreign commerce bets, wagers, and information assisting in the placing of bets and wagers on a sporting event and contest,

All in violation of Title 18, United States Code, Section 371.

Beginning in or before October 2020, through and including on or about April 17, 2021, in the Western District of New York and elsewhere, the defendant **TOMASSO SESSA**, violated Title 18, United States Code, Section 371, an offense described as follows:

The defendant, **TOMASSO SESSA**, knowingly and willfully conspired and agreed with **LOUIS P. FERRARI II**, **DOMINIC SPRAGUE**, and others to commit an offense against the United States, that is, to violate Title 18, United States Code, Section 1955 by knowingly conducting, financing, managing, supervising, directing, and owning all or part of an illegal gambling business, which gambling business was a violation of the laws of the State of New York—that is, New York Penal Law Sections 225.00, *et seq.*—and which involved five or more persons who conducted, financed, managed, supervised, directed and owned all or part of said illegal gambling business, and which remained in substantially continuous operation for a period in excess of thirty days and had a gross revenue of $2,000.00 in any single day,

All in violation of Title 18, United States Code, Section 371.

This Criminal Complaint is based on these facts:

**SEE ATTACHED AFFIDAVIT OF Marilyn K. Halliday, SA, HSI**

☒  Continued on the attached sheet.

MARILYN K HALLIDAY    Digitally signed by MARILYN K HALLIDAY
Date: 2023.02.14 16:18:01 -05'00'

*Complainant's signature*

Marilyn K. Halliday, SA, HSI
*Printed name and title*

Application submitted by email/pdf and attested to me and before me as true and accurate by telephone consistent with Fed.R.Crim.P. 4.1 and 41(d)(3).

Date:    February 15, 2023

*Judge's signature*

City and State:  Rochester, New York

HON. MARK W. PEDERSEN, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

STATE OF NEW YORK         )
COUNTY OF MONROE          )     SS:
CITY OF ROCHESTER         )

I, **MARILYN K. HALLIDAY**, being duly sworn, depose and state:

1.      I am a special agent with the Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI).  I have been employed by HSI as a Special Agent since 2010.  I am currently assigned to the HSI Buffalo Nickel City Financial Task Force in Buffalo, New York.  As part of my duties as a special agent with HSI, I investigate crimes involving violations of federal law, including violations of Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Section 1084 (Transmission of Wagering Information); Title 18, United States Code, Section 1955 (Prohibition Illegal Gambling Businesses); and Title 18, United States Code, Section 1956 (Money Laundering).

2.      As a special agent, I am a federal law enforcement officer within the meaning of Rule 41(a) of the Federal Rules of Criminal Procedure, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18 of the United States Code.  During my law enforcement career, I have participated in investigations targeting the operation of illegal gambling businesses.  As part of my employment with HSI, I successfully completed the Federal Law Enforcement Training Center Criminal Investigator Training Program and U.S. Immigration and Customs Enforcement Special Agent Training, both of which included intensive instruction regarding

conducting wire fraud investigations, including application for and execution of, search and arrest warrants, as well as application for criminal complaints, and other legal process. I am familiar with how individuals and groups conspire to operate illegal gambling businesses and how those individuals utilize wire transmissions in interstate or foreign commerce to facilitate their fraud schemes.

3.      I make this affidavit in support of an application for a Criminal Complaint charging:

   a.      LOUIS P. FERRARI II ("FERRARI") with violating Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Section 1084 (Transmission of Wagering Information); Title 18, United States Code, Section 1955 (Operation of an Illegal Gambling Business); and Title 18, United States Code, Section 1956 (Money Laundering);

   b.      DOMINIC SPRAGUE ("SPRAGUE") with violating Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Section 1084 (Transmission of Wagering Information); and Title 18, United States Code, Section 1955 (Operation of an Illegal Gambling Business);

   c.      ANTHONY AMATO ("AMATO") with conspiring to violate Title 18, United States Code, Section 1084 (Transmission of Wagering Information), in violation of Title 18, United States Code, Section 371 (Conspiracy);

   d.      JOSEPH LOMBARDO ("LOMBARDO") with conspiring to violate Title 18, United States Code, Section 1084 (Transmission of Wagering

Information), in violation of Title 18, United States Code, Section 371 (Conspiracy);

e.   JEFFREY BOSCARINO ("BOSCARINO") with conspiring to violate Title 18, United States Code, Section 1084 (Transmission of Wagering Information), in violation of Title 18, United States Code, Section 371 (Conspiracy); and

f.   JAMES CIVILETTI ("CIVILETTI") with conspiring to violate Title 18, United States Code, Section 1084 (Transmission of Wagering Information), in violation of Title 18, United States Code, Section 371 (Conspiracy); and

g.   TOMASSO SESSA ("SESSA") with conspiring to violate Title 18, United States Code, Section 1955 (Operation of an Illegal Gambling Business), in violation of Title 18, United States Code, Section 371 (Conspiracy).

4.   This affidavit contains information based on my own personal knowledge as well as information provided by other law enforcement agents and local law enforcement members.  As it is my purpose to obtain a criminal complaint for which only probable cause is required, I have not included every fact learned during the investigation.

## PROBABLE CAUSE

*A. Summary*

5.      Beginning in or around October 2020, HSI joined state and local law enforcement agencies to investigate illegal gambling occurring at 565 Blossom Road, Suite B, in Rochester, New York (hereinafter "565 Blossom").

6.      The details of that investigation are set forth below.   In sum, the investigation revealed that the defendants were conspiring to operate illegal poker games at 565 Blossom Road and an illegal sports betting operation through the website sport700.com.  Each individual defendant's involvement consisted of the following:

7.      FERRARI co-owned the illegal gambling operation at 565 Blossom Road with SPRAGUE.  FERRARI also operated an illegal sports betting book through the website sport700.com.  FERRARI managed individual bettors and also oversaw sub-agents who had their own books of individual bettors.  FERRARI also owns and operates Ferrari Excavating at 45 Steel Street in Rochester, New York.  FERRARI collected cash payment of gambling losses from players at 45 Steel Street and then laundered the illegal proceeds through the Ferrari Excavating business.

8.      AMATO was the administrator of the website sport700.com and assisted FERRARI and others in creating accounts, usernames, and passwords.  AMATO also managed individual bettors and also oversaw sub-agents who had their own books of individual bettors on sport700.com.

4

9.    SPRAGUE co-owned the illegal gambling operation at 565 Blossom Road with FERRARI and was a sub-agent under FERRARI through sport700.com. SPRAGUE also owned and operated a pawn shop at 508 Stone Road in Greece, New York.  SPRAGUE collected cash payments of gambling losses from bettors and paid gambling winnings to bettors at 508 Stone Road.

10.    SESSA managed the day-to-day operations of the illegal gambling operation at 565 Blossom Road.

11.    LOMBARDO was a sub-agent under FERRARI through sport700.com.

12.    BOSCARINO was a sub-agent under FERRARI through sport700.com.

13.    CIVILETTI was an employee of SPRAGUE's pawn shop.  While working at the pawn shop, CIVILETTI collected payments of gambling losses from people on behalf of FERRARI and SPRAGUE.

### B. Background Regarding Illegal Bookmaking

14.    Based on my training and experience and conversations with other members of law enforcement, I know the following:

15.    In a bookmaking or sports betting operation, individuals place bets with a bookmaker predicated on the outcome of future sporting events (e.g., football, baseball, hockey, or basketball).

16.    Traditionally, bettors placed bets by contacting a bookmaker either in person or by telephone.  More recently, some bookmakers have started using internet

gambling websites to facilitate betting.  Bookmakers give their bettors individual accounts on the website, which includes a personal username and password.  The bettors can then place and track their wagers by logging on to the website.

17.     Bookmakers accept wagers directly from individual bettors.  Bookmakers can also accept bets through sub-agents (*i.e.*, subordinate bookmakers who manage individual bettors and then pay a fraction of the sub-agents' winnings up to the main bookmaker).

18.     Bets are sometimes taken on margin/credit, meaning no money is exchanged between the bookmaker and the bettor before the wager is accepted.

19.     A few days after the placing of bets, the bookmaker will usually meet with bettors, sub-agents, and other bookmakers to "settle up" the bets, totaling the dollar amounts of their wins and losses.

20.     It is a violation of New York Penal Law § 225.05 (Promoting Gambling in the Second Degree) to knowingly advance or profit from illegal gambling.  New York law defines "gambling" as "stak[ing] or risk[ing] something of value upon the outcome of a contest of chance or a future contingent event not under the bettor's control or influence, upon an agreement or understanding that [the bettor] will receive something of value in the event of a certain outcome."  NY Penal Law § 225.00(2).  This includes bookmaking.  NY Penal Law § 225.00(9).

21.    It is a violation of New York Penal Law § 225.10 (Promoting Gambling in the First Degree) to engage in illegal bookmaking by receiving or accepting in any one day more than five bets totaling more than five thousand dollars.[1]

### C. Background Regarding Card Games

22.    Hold-em is a variety of poker in which each player is dealt two cards face down and may use either or both of them, in combination with any of five cards dealt face up and shared by all players, to form the best possible hand.  Which cards each player is dealt during a particular hand is a matter of chance that the player has no control or influence over.  Players place bets on whether they will have the best hand before the other players' hands are revealed.

23.    A pot is the total sum of the bets made on a round in poker.

24.    A rake is a fee, generally in the form of a percentage of the pot, taken by the operator of a poker game as profit for hosting the game.

25.    A gambling marker is a short-term, interest-free line of credit that gambling establishments offer customers to use for gambling.  These lines of credit are no longer interest-free if unpaid by the end of a specified gambling period.

---

[1] In-person sports wagering at licensed casinos has been legal in New York since 2019.  *See* N.Y. Rac. Pari-Mut. Wag. & Breed. Law § 1367.  Further, in 2022, mobile sports wagering through certain licensed platforms became legal in the State of New York.  *Id.*  However, unlicensed bookmaking, whether in person or online, has been and remains illegal in the State of New York.

26.     It is a violation of New York Penal Law § 225.05 (Promoting Gambling in the Second Degree) to knowingly advance or profit from unlawful gambling activity.  New York law defines "gambling" as any game in which a player "stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his control or influence, upon an agreement or understanding that he will receive something of value in the event of a certain outcome."  NY Penal Law § 225.00(2).  It defines unlawful gambling as any gambling not specifically authorized by law.  NY Penal Law § 225.00(12).

### D.  Undercover Operations[2]

27.     On or about September 26, 2020, a law enforcement officer acting in an undercover capacity (hereinafter the "UCO") attended a card game at 565 Blossom Road. Upon entering the premises, the UCO observed a series of office-type rooms surrounding an open area with gaming tables.  Multiple televisions were hung along the walls and there were lounge chairs for watching the televisions.  A mini bar and a small refrigerator were located near the center of the room.  A hallway towards the back lead to two bathrooms and a closed door that appeared to lead to a smoking area.  The UCO purchased $500 worth of poker chips to begin playing.  The poker chips were contained a Ferrari logo, as pictured below.  The UCO and several other bettors played "hold-em."  The dealer took a rake from each deal throughout the poker game.  The rakes were placed into a tray and an uncharged co-conspirator (CC-1) would periodically remove the rake tray and replace it with an empty one.

---

[2] This section highlights some of the interactions between the UCO and the defendants.  It does not include every interaction between the UCO and the defendants, every date on which the UCO attended an illegal card game at 565 Blossom Road, nor every bet the UCO placed through the sport700.com website.



28.    On or about September 29, 2020, the UCO received a text message from an uncharged co-conspirator (CC-2), which stated:

> "NEW BIGGER BETTER SPOT AT Blossom Poker Tonight 7pm! Orbiting 2/5NLH with 1/2/5 Pot Limit Omaha!! $30 free play on the Yankee/Indians game with your buy in if here before 1st pitch (7pm) Also 10% buy in bonus (up to $50) With your buy in by 7:30pm! doors open at 6pm!! High Hands all night long!! With Catered Food and Lovely **REDACTED** here to serve and cater to your table side massaged!"

29.    The UCO entered 565 Blossom Road that evening and observed CC-2 seated at a table with FERRARI. At one point, the UCO observed FERRARI entering a code on a locked office door keypad and entering the office with CC-2. FERRARI exited the office a short time later with a black, zippered, notebook and departed the premises. The UCO met another uncharged co-conspirator (CC-3) that evening. CC-3 told the UCO that CC-3 was a dealer at 565 Blossom Road. After FERRARI left, the UCO had a conversation with CC-2. CC-2 stated 565 Blossom Road was not yet set up the way the two owners wanted. CC-2 stated CC-2 runs that location for the owners. CC-2 stated FERRARI just shows up to drop off money to pay out the winners. CC-2 also told the UCO that CC-2 takes cash bets at 565

Blossom Road in a betting room located near the entrance. CC-2 also informed the UCO that the poker games would improve once FERRARI's partner and friend "DOM" comes in. CC-2 described DOM as an aggressive and poor gambler.

30.    On or about October 1, 2020, the UCO entered 565 Blossom Road and played poker. CC-3 was working as a dealer for the poker games and was taking rakes during game play. While playing poker, the UCO observed another player asking CC-2 to put $1,000 on the second half of an NFL football game being displayed on one of the TVs. CC-2 went over to the betting room and returned with a slip of paper for that player. A short time later, the UCO approached CC-2 and asked if the UCO could place bets on some of the NFL football games scheduled for that weekend. CC-2 agreed, and the UCO placed two bets with CC-2. The UCO handed CC-2 $200. CC-2 entered some information in CC-2's computer and handed the UCO a betting slip. The betting slip had a website address at the bottom: *http://sportsbookvip-com/rules.html*. While CC-2 was entering information into CC-2's computer, the UCO was able to see a portion of the website address: "Backend.sport700." Also present that evening at 565 Blossom Road was SPRAGUE. SPRAGUE was serving players food throughout the evening. When the UCO finished playing that evening, the UCO took their remaining poker chips to SPRAGUE and turned them over to SPRAGUE in exchange for money.

31.    On or about October 6, 2020, the UCO returned to 565 Blossom Road. Upon arriving, the UCO was greeted by CC-1 and CC-2. CC-2 paid the UCO $396 for winning the bets the UCO placed on October 1, 2020 ($200.00 in funds that were deposited to place the bet and $91.00 and $105.00 for the two bets that were won). The UCO then purchased chips from SPRAGUE utilizing the winnings from those bets and additional funds and began

10

playing poker.  CC-3 and another uncharged co-conspirator (CC-4) were dealing the poker games and taking rakes from each hand dealt.

32.     On or about October 16, 2020, the UCO spoke with CC-1 on the phone.  CC-1 stated CC-2 was no longer working at 565 Blossom Road.

33.     On or about October 18, 2020, the UCO received a phone call from CC-1.  CC-1 stated that since CC-2 was no longer working at 565 Blossom Road, CC-4 and another uncharged co-conspirator (CC-5) would be assuming CC-2's duties.

34.     On or about October 27, 2020, the UCO received a text message from CC-4 inviting the UCO to play poker at 565 Blossom Road.  The UCO arrived at the gambling location and purchased chips for game play.  The UCO played poker and rakes were taken in by the dealers during game play.  While playing poker, the UCO observed both FERRARI and SPRAGUE enter the gambling location and have private and public conversations with CC-4.  At one point, the UCO knocked on the closed office door where FERRARI, SPRAGUE, and CC-4 were having a conversation.  The UCO asked CC-4 if CC-4 would be accepting sports bets like CC-2 had.  CC-4 answered in the affirmative.  The UCO then sat down in a chair near the TV and was approached by FERRARI.  FERRARI asked the UCO if the UCO was gambling on the baseball game that was being displayed on the TV.  The UCO noticed FERRARI was looking at a website on his cell phone titled sport700.  FERRARI asked the UCO for the UCO's phone number.  A short time after giving FERRARI the UCO's phone number, the UCO received a text message from FERRARI which stated, www.sport700.com, followed by another text message that included a username and a password.  FERRARI stated those text messages were the website to place bets and the

password for the UCO's account. FERRARI informed the UCO that the UCO would be paid for any winning bets on Tuesdays and the UCO should pay for any losses on Tuesdays as well. FERRARI informed the UCO that if the UCO was at 565 Blossom Road, the UCO could either pay FERRARI or CC-4 for any gambling losses.

35.     On or about October 29, 2020, the UCO received a text message from FERRARI inviting the UCO to attend a poker game at 565 Blossom Road scheduled for October 30, 2020.

36.     On or about October 30, 2020, the UCO entered 565 Blossom Road, but did not observe the usual people running the poker games. Instead, the UCO observed SESSA learning from an unknown male how to take rakes, deal the games, and run the gambling operation. The UCO only played a few poker hands that evening and the operators of the gambling location did not take a rake while the UCO played because there were not enough players participating. That poker game was organized by the players sitting at the table. After departing the gambling location, the UCO logged into the www.sport700.com website utilizing the account and password provided by FERRARI. The UCO placed several sports bets on the website utilizing the "credits" loaded into the UCO's account by FERRARI. The UCO was given a limit of 3,000 credits: one credit being equal to $1.00, 3,000 credits being equal to $3,000.00, and so on.

37.     On or about November 3, 2020, the UCO entered 565 Blossom Road and was greeted by CC-3 and CC-4. The UCO purchased poker chips from CC-3. CC-4 retrieved the chips from the office. The UCO played poker and rakes were taken in by the dealers during game play. While playing poker, the UCO texted FERRARI and asked him if he would be

coming to 565 Blossom Road that evening. FERRARI eventually texted the UCO and instructed the UCO to pay CC-4 the money that the UCO owed FERRARI for the UCO's online sports gambling losses from bets placed by the UCO on the sport700.com website the week prior. The UCO paid CC-4 the money the UCO owed FERRARI and departed the premises a short time later.

38.     On or about November 7, 2020, the UCO logged into the sport700.com website utilizing the account and password provided by FERRARI. The UCO placed several sports bets on the website utilizing the credits loaded into the UCO's account by FERRARI. Those bets resulted in a $659 loss.

39.     On or about November 10, 2020, the UCO entered 565 Blossom Road and observed CC-3 and CC-4 working there. The UCO texted FERRARI and asked if he would be present at the gambling location that evening. FERRARI instructed the UCO to give the gambling losses to CC-4. The UCO gave the $659 in gambling losses owed to FERRARI to CC-4 and departed the premises.

40.     On or about November 19, 2020, the UCO entered 565 Blossom Road. The UCO informed SESSA that the UCO owed FERRARI money for a debt incurred from previous gambling losses. SESSA informed the UCO that FERRARI may not be visiting that gambling location that evening, but the UCO could pay SESSA the money to give to FERRARI. The UCO paid SESSA the $545 owed to FERRARI.

41.     On or about December 1, 2020, the UCO went back to 565 Blossom Road. SESSA, LOMBARDO, CC-3, CC-4, two unidentified co-conspirators (CC-7 and CC-8), and approximately four other individuals were already in the location when the UCO arrived.

SESSA came to the table as players were buying in and, using a pen and what appeared to be a typed excel sheet, began making notations on the excel sheet with each buy in. CC-3 dealt and took a rake with each hand that did not result in a chop. After some time, CC-4 replaced CC-3 as the dealer. CC-7 became frustrated during the game and made a threat (in a joking manner) that he was going to shoot someone. CC-8 responded, "I'm the only one here packing," and lifted the right side of his hooded sweatshirt. The UCO observed a small black handgun sticking out of CC-8's waistband. CC-7 and CC-8 had a brief conversation about the gun, during which CC-8 stated that the gun was hot, so he doesn't drive with it. After the UCO had been playing for a while, SPRAGUE entered carrying beer and other items. SPRAGUE asked who wanted a corona, served two of the players at the table, and told them good luck. Then SPRAGUE went into the office with SESSA. Later, FERRARI entered the location. Before leaving for the night, the UCO went to the office to speak with FERRARI and SPRAGUE about his winnings from the prior week's bets. FERRARI had a notebook open and turned to a page with approximately four lines of writing on it. FERRARI read from the bottom line and stated: "1354?" The UCO confirmed and FERRARI counted out $1,360 from a stack of 20-dollar bills that was approximately 10 inches high. FERRARI asked SPRAGUE to check his count, which SPRAGUE did. SPRAGUE then handed the money to the UCO. As the UCO began to exit the office, FERRARI invited the UCO to a game being held at 565 Blossom on Thursday.

42.    On or about December 10, 2020, the UCO texted FERRARI to arrange to pay off a gambling debt. FERRARI instructed the UCO to go to the pawn shop owned by SPRAGUE and give the money to a man named "JIM" (JAMES CIVILETTI). Upon arriving at the pawn shop located at 508 Stone Road, the UCO recognized CIVILETTI. The

UCO asked CIVILETTI if SPRAGUE was there and CIVILETTI said no. CIVILETTI told the UCO if the UCO had something for SPRAGUE, "then I'm your guy." The UCO took $1,500 out of an envelope and handed it to CIVILETTI. CIVILETTI asked the UCO how much money it was and who it was for. The UCO replied, "1500" and "LOU." The UCO thanked CIVILETTI and departed the premises.

43.     On or about December 30, 2020, FERRARI texted the UCO that FERRARI had money to pay the UCO for gambling winnings from bets the UCO placed with FERRARI. FERRARI instructed the UCO to return to SPRAGUE's pawn shop and retrieve the money. Upon arriving at the pawn shop, the UCO interacted with CIVILETTI. CIVILETTI asked the UCO if the UCO was picking something up and for how much. The UCO stated, "26 something." CIVILETTI asked the UCO for identification and the UCO produced a driver's license. CIVILETTI photographed the license with his phone and made a phone call. After the phone call, CIVILETTI counted out $2,630 and handed it to the UCO. The UCO thanked CIVILETTI and departed the premises.

44.     On or about February 10, 2021, the UCO called FERRARI to arrange to collect his gambling winnings. FERRARI directed the UCO to go to SPRAGUE's pawn shop to collect the money. FERRARI and the UCO agreed that the UCO was entitled to $3,300. When the UCO arrived at SPRAGUE's pawn shop, SPRAGUE and CIVILETTI were there. SPRAGUE counted out $3,300 and handed it to the UCO.

### E. Execution of Eavesdropping Warrants on FERRARI's Phones

45.     On or about November 17, 2020, New York State Supreme Court Justice Honorable Victoria M. Argento signed an *ex parte* eavesdropping warrant authorizing the use

of tap and trace devices to monitor and record the electronic communications through the cellular device (XXX) XXX-0001 ("PHONE 1"), utilized by FERRARI.  This warrant was extended on or about December 4, 2020, January 2, 2021, and January 26, 2021.

46.     On or about December 15, 2020, New York State Supreme Court Justice Honorable Victoria M. Argento signed *ex parte* eavesdropping warrants authorizing the use of tap and trace devices to monitor and record the electronic communications through the cellular device (XXX) XXX-9944 ("PHONE 2"), utilized by FERRARI.  This warrant was extended on or about January 13, 2021 and February 9, 2021.

47.     The following are summaries and excerpts of some of the incriminating phone calls and text message exchanges that law enforcement captured during those months.

### i.     *Communications between FERRARI and SPRAGUE*

48.     Throughout the months when FERRARI's calls were being intercepted by law enforcement, FERRARI and SPRAGUE had numerous calls and text exchanges regarding the placement of bets, payments to and from individual bettors, and the management of 565 Blossom Road.

49.     On or about November 21, 2020, law enforcement intercepted a series of phone calls between FERRARI and SPRAGUE.  FERRARI and SPRAGUE discussed the fact that CC-4 needed $2,000 at 565 Blossom Road to pay out the winners of the illegal card game that was taking place that evening.  FERRARI and SPRAGUE discussed who would bring the $2,000 to the gambling location.  SPRAGUE contacted CIVILETTI and CIVILETTI agreed to pick up $2,000 from FERRARI and transport the currency to the gambling location.

50.    Between on or about November 21 and 23, 2020, SPRAGUE and FERRARI had several calls during which they discussed turning off a particular bettor's account and collecting money that the bettor owed for previous bets.

51.    On or about December 1, 2020, SPRAGUE called FERRARI to discuss a particular bettor who had won that week.  FERRARI told SPRAGUE that the bettor "dinged me for eighty grand" when FERRARI was on his honeymoon.  SPRAGUE agreed the bettor was too good at winning and that he could not keep him on his book anymore.

52.    On or about December 6, 2020, FERRARI called SPRAGUE to tell him that a person FERRARI referred to as "[expletive] face" was "back in his house."  Based on my training and experience and my knowledge of this investigation, I believe that FERRARI was referring to CC-2, the individual who previously managed the illegal gambling operation at 565 Blossom Road for FERRARI and SPRAGUE.  The following conversation ensued:

| SPRAGUE | …we have to go pay him a visit. |
| FERRARI | I'm… just gonna be honest with you, man.  I already felt it.  Eh… there's something I can't… |
| SPRAGUE | Right. |
| FERRARI | …explain it to you but this thing happens to my body. |
| SPRAGUE | Yeah. |
| FERRARI | And I seen that car, it started happening, it's… I don't…I… I don't even… I'm not even gonna drive down [REDACTED] Road on the way home, I swear to God.  I'm gonna have a hard time… with this. |
| SPRAGUE | Yeah. |
| FERRARI | A really hard time… I lose control, something comes over me it's, it's… yeah. |

| | |
|---|---|
| SPRAGUE | Oh, we just gotta be smart so we don't go to jail. You know? |
| FERRARI | Right, yeah, yeah.  Well, that's why I was calling you I knew you'd talked off the ledge. |
| SPRAGUE | Yeah. |
| | . . . |
| SPRAGUE | So, the, um… yeah, dude, we just gotta play our cards right, with this guy.  I don't think he, uh… I don't even think he sh-… like, should be showing his face anywhere.  I think he's a [expletive] sleaze ball.  I talked to a couple of people, I guess… I guess he's… he's, um… he's robbed everyone, dude.  He's robbed like, his whole family, everyone, he does this to everyone.  And he thinks it's okay. |
| FERRARI | Scumbag. |
| SPRAGUE | But, I mean I don't know what, what his goals are but… |
| FERRARI | Can you [U/I]… |
| SPRAGUE | You know, I think… I think we should, uh… have a conversation with him and tell him to get the [expletive] out of town.  Don't come around here, or some bad things are gonna happen.  I think he's in town 'cause he's a [expletive] snake in the grass, and all this [expletive]… bringing up all this cop [expletive], and "cop that."  And I think he back in town to fu-… you know? I don't know. I don't know. I don't know all that [expletive] cop talk he is talking. Makes me nervous about everything.  You know? |
| FERRARI | Yeah? |
| SPRAGUE | But… I don't know, I don't see his angle, dude.  It's… he had the world by the balls. So, he [expletive]… |
| FERRARI | Yeah, he's scumbag. |
| SPRAGUE | He lost a little money and then he [expletive]… I don't know… |

. . .

53.    On or about December 10, 2020, FERRARI called SPRAGUE and asked if "Jim" (*i.e.* CIVILETTI) was "at the store." SPRAGUE said that CIVILETTI was there, and FERRARI asked, "I got somebody at Tops on Mount Read. Can I send 'em to the store with it." When SPRAGUE asked, "with what?", FERRARI responded, "he's our friend" and "it's good for you and good for me." SPRAGUE ultimately agreed, "yeah, send him there."

54.    On or about December 18, 2020, SPRAGUE informed FERRARI that an uncharged co-conspirator (CC-6) was upset CC-6 had paid SPRAGUE and FERRARI over $35,000 and they were not treating CC-6 right. SPRAGUE said he told CC-6 to stop at SPRAGUE's pawn shop and CC-6 declined to do so. SPRAGUE informed FERRARI that he was going to go see CC-6. FERRARI instructed SPRAGUE to "punch him in the face." SPRAGUE stated he was not going to do that. SPRAGUE informed FERRARI he was "leaving my jewelry store now to go pay this guy his gambling money." FERRARI replied, "welcome to my world."

55.    On or about December 26, 2020, during a call between FERRARI and SPRAGUE, FERRARI said that SESSA was sick. FERRARI and SPRAGUE discussed whether to close 565 Blossom Road for a week while SESSA recovered. FERRARI decided they would open the location and allow CC-4 and CC-5 to run illegal card games there while SESSA recovered.

56.    On or about December 29, 2020, law enforcement intercepted a series of text messages between FERRARI and an uncharged co-conspirator (CC-9), an individual who had previously exchanged text messages with FERRARI regarding the placement of bets on

the website.   FERRARI asked CC-9, "any chance you can give Dominic [SPRAGUE] a Venmo of $1,000?"  CC-9 responded, "I only have cash app they closes (sic) my PayPal and Venmo."  FERRARI then told CC-9, "Cash app dom please."

57.   On or about January 9, 2021, FERRARI and SPRAGUE had a phone conversation during which they discussed the payment of rent at 565 Blossom Road. SPRAGUE indicated that he would give the landlord a check for rent and would pay it for the entire year, stating "I think I'll – you want me to pay it this year, then I'll… I'll get the write-off?"  FERRARI agreed.

58.   On or about January 19, 2021, FERRARI and SPRAGUE had another call during which they discussed the payment of rent at 565 Blossom Road.  The two also discussed hosting blackjack games at the location and how to shuffle the deck and deal in a way that ensures that the house never loses money.

59.   On or about February 23, 2021, FERRARI called SPRAGUE and said he had just assaulted CC-2.  They following is a transcript of that conversation:

| | |
|---|---|
| SPRAGUE | Hello? |
| FERRARI | Hey, where are you? I need help. I just beat up [CC-2] at his house. His wife called… |
| SPRAGUE | Come on, dude. |
| FERRARI | Yeah, his wife called the police on me. Where are you? |
| SPRAGUE | I'm in… I'm at Brockport, Spencerport Line Road. |
| FERRARI | Ugh. [BREATHES HEAVILY] Yeah, I just beat him up in his garage. |

| | |
|---|---|
| SPRAGUE | Oh, my God. Are you… did you leave? |
| FERRARI | Yeah, his wife called the police on me. |
| SPRAGUE | Well, where are you going? |
| FERRARI | I don't know. I gotta stash my truck. [PAUSE] Send me his phone number… |
| SPRAGUE | Where do you wanna stash it at, Tommaso's house? [BACKGROUND: Unintelligible conversation.] |
| FERRARI | What's his… what's his phone number? |
| SPRAGUE | Who's? |
| FERRARI | [CC-2's]. |
| SPRAGUE | I don't know. You want his old phone [AUDIO GLITCH] number? |
| FERRARI | I don't… I know his old phone number. |
| SPRAGUE | [PAUSE] [BACKGROUND: Unintelligible conversation.] [ASIDE: You have [CC-2's] new phone number?] |
| FERRARI | I beat him up. No. I need it. |
| SPRAGUE | [CC-4]… the dealer. I can give you [CC-4's] number. |
| FERRARI | C-c-call him up and get the number. Call [CC-2]. |
| SPRAGUE | [AUDIO GLITCH] [U/I] |
| FERRARI | [AUDIO GLITCH] …[expletive]' smart. |
| SPRAGUE | I'm gonna call… I'm gonna try to get his number right now. |
| FERRARI | You gotta get ahold of him. You gotta talk to him. |
| SPRAGUE | Alright. Alright. |
| FERRARI | Alright, bye. |

60.    The two then switched to a different line and continued their conversation:

| | |
|---|---|
| SPRAGUE | …buddy, he said, "No." You know? I was gonna tell him to do the right thing, but… |
| FERRARI | Yeah. Okay, good. |
| SPRAGUE | … he-he told me the good, the right, thing. You know? I was like, "You alright?" He was like, he's like, "Nah, he sucker punched me in the [expletive]' chest… and in the… the jaw, or something." I was like, "But you're… nothin's broken, right? You're good?" He's like, "Yeah, I'm not a [expletive]' rat, dude. I'm not gonna [expletive]'…whatever." So, I don't know if… I don't think the wife can charge anything, right? |
| FERRARI | [Expletive] her! |
| SPRAGUE | Just say you didn't do nothin'. |
| FERRARI | She didn't even see nothin', dude. B-bro, this is… |
| SPRAGUE | Alright. |
| FERRARI | I don't give a [expletive] who could listen to this line… I beat the [expletive] out of him. And I told him… |
| SPRAGUE | Yeah. |
| FERRARI | I s-… "I'll step on your [expletive]' face… if you don't go inside and give me every dollar inside that [expletive]' house." And as soon as he went inside the house, he was gonna go get me money… the fu-… I seen the wife out in the, uh… out in the front yard, on the telephone. |
| SPRAGUE | Yeah. |
| FERRARI | Dude… Dominic… I [expletive]' hit him so [expletive]' hard. He [expletive]-… he went down like a ton of bricks. |
| SPRAGUE | [LAUGHS] Oh, geez. |
| FERRARI | [expletive] him. [expletive] him. |
| SPRAGUE | Alright, well, I mean… I don't know… uh, whatever… hopefully… once you say you don't press |

|            | charges, you can't. right? |
|------------|-----------------------------|
| FERRARI    | Yeah… no way. I didn't even do nothin'. There's no marks on him. I hit him in the stomach. My boxing coach taught me. |
| SPRAGUE    | Alright. |
| FERRARI    | [Redacted] pickin' me up. I stashed my truck at my brother's house. |
| SPRAGUE    | Alright, well, hopefully he's not lyin'… I don't know… what the [expletive]'s happenin ', but I told him I'll call him back… |
| FERRARI    | I called him a federal snitch. |
| SPRAGUE    | I'm just… I'm buying this [expletive]' tanning bed right now, so… I couldn't do anything. |
| FERRARI    | Yeah, alright. |
| SPRAGUE    | But I got his number. I sent you his number in the picture, if you click the picture, it's at the top. |
| FERRARI    | Well, my phone's on airplane mode… my phone's on airplane mode. |
| SPRAGUE    | Alright, so… |
| FERRARI    | I'm good now. I'm going home. |
| SPRAGUE    | Whatever, let me get rid of this… let me get this, um… get this tanning bed, and then I'll-I'll give you a shout. |
| FERRARI    | Alright, bye. |

*ii.    Communications between FERRARI and BOSCARINO*

61.    On or about November 11, 2020, law enforcement intercepted a text message exchange between FERRARI and BOSCARINO.  FERRARI started the conversation by

asking, "I need an account for layoff.[3] You got a solid guy?"  BOSCARINO responded, "Ha, The only one I know that will actually pay is Fat [REDACTED]. Theres a lot of small guys out there but not that u can trust."  FERRARI indicated he would ask to open an account the next day and then asked BOSCARINO if he had any guys "looking to get down?"  BOSCARINO responded that his "main guy that owed" money was dead and overdosed on fentanyl.

62.     On or about December 8, 2020, FERRARI again asked BOSCARINO to identify potential bettors for their book.  BOSCARINO mentioned a deceased bettor who owed FERRARI and BOSCARINO a lot of money and never paid them before he died. BOSCARINO then said he would make some calls to bettors that he knew through other bookies and "get 'em to go through me now."  BOSCARINO then instructed FERRARI to set the bettors' limits on the website because "this way nobody can go nuts."  FERRARI agreed to do so.

63.     On or about December 10, 2020, BOSCARINO texted FERRARI and said that he had "a couple more guys that should be going on the site starting today."  BOSCARINO and FERRARI then discussed the terms for the bettors.

64.     On or about December 18, 2020, law enforcement intercepted a phone call between FERRARI and BOSCARINO.   BOSCARINO explained to FERRARI that BOSCARINO placed the wrong bet for a player and asked FERRARI to check the website. FERRARI stated he was going to go to his office, pull up the website, and check the bet out.

---

[3] A "layoff" is a bet that one bookmaker places with another bookmaker to help reduce the exposure on a certain game.

Later that day, FERRARI called BOSCARINO back and confirmed that BOSCARINO had entered the bet wrong on the website.  FERRARI then confirmed that he deleted the inaccurate bet.  BOSCARINO then texted FERRARI, "I have your envelope ready please give me the exact dollar amount I owe."  FERRARI responded by telling BOSCARINO to keep 10% for himself and leave the rest with his secretary at "45 steel street."

65.    On or about December 30, 2020, BOSCARINO texted FERRARI, "I'll be at the shop tomorrow morning to drop off $."

66.    On or about January 1, 2021, BOSCARINO texted FERRARI and asked FERRARI to enter a bet for a player.  FERRARI confirmed the bet was placed.  Then BOSCARINO texted, "Good thing about this crazy [EXPLITIVE] is if he wins he will try to double it."

67.    On or about January 3, January 9, January 10, January 11, January 17, January 24, January 31, February 6, February 7, February 9, and February 10, 2021, BOSCARINO texted FERRARI asking to take or alter bets for players on the sport700.com website.

68.    In the January 10 and January 11, 2021 text exchanges, FERRARI indicated that he was in Florida.

69.    On or about January 5, 2021, BOSCARINO texted FERRARI that he was bringing $8,000 in winnings to FERRARI's secretary (who BOSCARINO identified by name) at "steel st."

70.    Approximately once per week, BOSCARINO texted FERRARI and told him the sum of their winnings over the past week.  BOSCARINO then arranged to meet

FERRARI to payout his share.  BOSCARINO usually indicated he would bring the money to either 45 Steel Street or SPRAGUE's pawn shop.

### iii.   Communications between FERRARI and LOMBARDO

71.     On or about November 20, 2020, law enforcement intercepted a phone call between FERRARI and LOMBARDO.  LOMBARDO told FERRARI that he was having trouble collecting money from his bettors.  FERRARI asked, "Did you talk to Dom about this?" to which LOMBARDO responded, "he said to call you."  FERRARI then chastised LOMBARDO for always being short on his payments.  The following conversation ensued:

| | |
|---|---|
| FERRARI | I mean, uh… [STAMMERS] it sounds like this is same thing, over and over again. I've never… you've never paid in full, ever.  But you want me to keep paying all these guys that win.  Are you in… are you in cahoots with these people, or what?  Or is it just every guy you know a [EXPLETIVE] stiff? |
| LOMBARDO | What do you mean?  What do you mean?  This is … |
| FERRARI | [U/I] |
| LOMBARDO | This is the first time I had to get money [PH] from you. |
| FERRARI | This is not the first time you've came up lame, though.  You haven't given eighty percent of the number, or ninety percent of the numbers since day one. We're all, I mean, we carry over, carry over, carry over… I'm not trying to give you a push back but I'm just trying – I mean [expletive] working in the middle of a Friday, you talk to Dominic, Dominic is sending me a text, you're calling me… If you need five hundred dollars, yeah, go… go… I'll send you some place to go pick it up.  But why? I don't get it.  [STAMMERS] I don't understand.  How much… how much you short? |
| LOMBARDO | Um, I mean, I gotta look at everything, but… [STAMMERS] I'm just… I'm mean, I'm just waiting on |

|  |  |
|---|---|
|  | people to pay me. I mean it's not like I can make people pay me. |
| FERRARI | I understand, but that's not how this works. Like you can't… [STAMMERS] I, I told you this three weeks ago. I don't know who your players are. It's not my job to send them credit [U/I]. I don't know people's passwords, I don't know Lucky, JR, this one, that one. That's not my concern. The bottom line, that's it. So, you can't make your player's problems, my problems. That's the reason why you're getting commission, you know what I'm saying? [U/I].. Ultimately, you're… you're on a hook for them. I know it's a [expletive] part of the business. But… well, Dominic gave you money to pay your guys just off the get-go, just outta good faith. I mean… I don't know. I don't do business this way, I guess, is my point. And if it was up – I should've just… if I had known this was the way that you and Dominic wanted to do things, I would've told Dominic, "You could have… take Coach all on your own." To me, you get, ninety percent out or eighty percent or whatever it is of the number, when they lose, and I pay out hundred percent when they win. I don't look at the number even for last week. Did they win overall or lose overall? |
| LOMBARDO | Uh, overall it was… um, it was a win. I mean [STAMMERS] a loss, loss, loss. |
| FERRARI | They lost overall? |
| LOMBARDO | Yes. And I'm just waiting on these three people. [U/I], he owes me six fifty. That's the big thing. And then two and three. |
| FERRARI | Alright, well, I'll call you as soon as I leave this job site. |

72.    On or about December 14, 2020, LOMBARDO called FERRARI and asked to take a bet "off the book" because the game at issue was about to start. FERRARI agreed.

73.    On or about January 29, 2021, LOMBARDO texted FERRARI and asked him to delete a pair of bets that were placed by a particular bettor through the website.

74.    On or about February 15, 2021, LOMBARDO called FERRARI and asked him to increase the betting limit on the website for a bettor whom LOMBARDO described as his "best guy" and "one of my most loyal guys."  FERRARI agreed to do so.

### iv.    Communications between FERRARI and SESSA

75.    On or about November 19, 2020, FERRARI called SESSA and directed SESSA to purchase more alcohol for 565 Blossom Road.

76.    On or about November 28, 2020, SESSA called FERRARI and FERRARI directed him to purchase more Coca Cola and beer for 565 Blossom Road.

77.    On or about December 7, 2020, SESSA called FERRARI and asked FERRARI to send out an invite for a game for the following day.  FERRARI agreed.  SESSA stated he wanted to do a 10% bonus buy-in that SESSA would cover out of his own pocket.  SESSA also informed FERRARI he wanted to start a $500 bad beat pot that gets larger every week and comes out of the rake.  SESSA stated people want to start seeing more free stuff.  SESSA informed FERRARI he needed to buy more beer and booze for the gambling location, and he would take care of it.

78.    On or about December 8, 2020, SESSA called FERRARI and the two discussed the preparations for that night's game at 565 Blossom Road.  FERRARI had trouble finding the alcohol at 565 Blossom Road and accused one of the dealers of stealing it.

79.    On or about December 18, 2020, SESSA and FERRARI had a phone call during which they discussed a particular bettor who wanted to be paid.  SESSA offered to

"take care of it," but FERRARI responded that he would "handle it" and that "we'll pay him, and we'll be done with him or just tell him, 'you gotta go online, that's it.'"

80.    On or about January 21, 2021, FERRARI called SESSA to discuss a game that occurred at 565 Blossom Road the night before.    SESSA recounted the following to FERRARI:

| | |
|---|---|
| SESSA | I just — I just went out, and… had to go take care of a few things, got our money back, and…we're all good now, but it just got a little bit out of control. |
| | . . . |
| | This guy's like, oh yeah, "I'll sign this… I'll sign this over to you, I'll sign that over to…" Long story short, it came to, like, [STAMMERS] four-thousand-dollars. I'm like, "You know what? I've had a-[expletive]' enough of this [expletive]." Grab the kid, I'm like, "I want my money now, we're gonna go get it." He's like, "[GRUNTS]." I don't give a [expletive] where you're gonna go find it; we're getting, in the car right now, and you're gonna go get me my money. |
| FERRARI | Yeah, good. |
| SESSA | So, we got – we got, uh… we got in this car and the kid's buggin' out. "I don't know where I'm gonna get the money, I don't know what this…" I'm, like… the house is not even in… [STAMMERS]. He's telling Dominic that his house is in his name, then find out that he doesn't even own a house. He-he's trying to give us the car title, [STAMMERS] the car's a [expletive]' salvage [expletive]'… title. So, long story short… |
| FERRARI | That guy… that kid's a jerk-off. |
| SESSA | He's-he's [STAMMERS] just a degenerate cokehead… gambler. |
| FERRARI | Yeah. Yeah, right, right. Yeah. |
| | . . . |

29

SESSA            I finally got fed up yesterday. I yelled at… [PAUSES] I had to yell at Dominic, I had to put him in his place. I had to [expletive]' grab this kid by his [expletive]' neck, and drag him into the… he took me, uh… he took me… [STAMMERS] he took me around all over Webster… to get this money. So, long story short, we ended up going back to this guy, this kid [redacted]. [Redacted] was at work, he couldn't go get the money, so… he gave me his jewelry, again. And…

FERRARI          Oh, my God.

SESSA            "I'll call you when I get off…" Yeah, "I'll call you when I get outta work" So, [SIGHS] I just got back [STAMMERS] so, I just met up with everybody. I got-I got our money back. [AUDIO GLITCH] Our money. It's basically Dominic's money, but…you know?

FERRARI          Yeah.

                 . . .

SESSA            It came to the point that I shut the game down, I grabbed [redacted] by the [expletive]' neck, I got him in the car, and I'm like, "You're gonna go get my money right now." I left, without knowing how much money… without counting everything. All I-all I knew that I was handed a couple hundred bucks, from being there from [STAMMERS] seven o'clock (7:00) [STAMMERS] five o'clock (5:00) the-the night before to eleven o'clock (11:00) in the mor-… I was handed a couple hundred bucks, and then I find out that these guys got… another three-hundred-and-fifty-dollars each?

                 . . .

SESSA            I'm protecting your money, because I'm prot-… like I said, the money is still bein' makin' [sic], because it's a Rough & Tumble, so it's just a rake. I'm here protecting your [expletive] because you're my bro [STAMMERS] you know, [STAMMERS] I'm looking out for you. I'm-I'm threatening people to go get their money, because it's your money. I could just sit back and say, "Hey, [STAMMERS] I'm still collecting my [expletive]' twenty (20) percent, I'm good." But, I'm p-putting my [expletive] in jeopardy, I-I go to this kid's

|              | house, I'm going to [expletive]' places to grab your money, and you disrespected me by you grabbing him, and making a count with him, instead of me? |
|--------------|---|
| FERRARI | Yeah, no. That's-that's bad for business, man. |
| SESSA | I was pissed. I was [expletive]' pissed, dude. |
| FERRARI | That's bad for business. |
| SESSA | It was [expletive]-… I was pissed. |
| FERRARI | No, you should be. |
| SESSA | But, once again., I know… I know there's… there was a lot of money made last night. I don't know how much, because like I said, I wasn't around. All I know is that… [PAUSES] he gambled a lot with his own money, so I know a lot went towards his money. |
| FERRARI | Yeah. |
| SESSA | I-I can't give you… I just know we did good, but I don't know where it is. |
| FERRARI | Well, as long as we made money… |
| FERRARI | Yeah, yeah. Exactly. A lot. |

81.     On or about February 5, 2021, FERRARI called SESSA to discuss another incident that happened during an illegal card game that took place at 565 Blossom Road the week before.  SESSA told FERRARI that one of the players brought a "thing" and dropped it on the ground.  SESSA asked FERRARI to ask the player not to bring it anymore, explaining, "God forbid, somebody shows up there… would you rather… would you rather get into a fist fight and not be strapped, or would you rather have the [expletive] police show up and get nailed with a Class A felony?"  Based on my training and experience and my knowledge of this case, I believe the "thing" SESSA and FERRARI were referring to was a gun.

v.    *Communications between FERRARI and AMATO*

82.    On or about January 2, 2021, law enforcement intercepted a phone call between FERRARI and AMATO.  FERRARI advised AMATO that FERRARI believed FERRARI's main cellular phone was bad and was being listened to by the police.  FERRARI advised AMATO the phone he was talking to AMATO on for this call was a "burner."  FERRARI advised AMATO that FERRARI was informed by a friend of FERRARI's, who is a trooper with the New York State Police, that the police were "looking at [FERRARI]" for gambling.  FERRARI advised AMATO that FERRARI had his phones wire-tapped by the police in 2014.  AMATO stated he remembered that.  FERRARI stated he never got brought in and "those guys took plea deals."  FERRARI stated he operates much smaller now and the police should be able to crack his case in three weeks or three hours.  FERRARI explained to AMATO that FERRARI's gambling location is a failure because one of the workers at the gambling location robbed one of FERRARI's dealers for $5,000 and the worker took $10,000 from FERRARI and FERRARI's partner and took off to Florida.  FERRARI and AMATO discussed how the police utilize wire taps and how often the police must renew them.  That discussion prompted FERRARI to ask AMATO to change the password for their online sports gambling website.  AMATO agreed and informed FERRARI that AMATO could change the name of the website as well, for example to "*wood500.com*."  FERRARI also asked AMATO if FERRARI should clear out all his bettors' balances on the website.  AMATO agreed that was a good idea.  FERRARI explained to AMATO, "I'm literally meeting with my buddies.  You know?  I mean, yeah, I get a piece of this and a piece of that, but [expletive] prove it."  "They're using my website.  You know what I'm saying?  How the [expletive] do you know that… that the sheet called DM1 is giving me anything?"  "The guy

pays me for a [expletive] service. That's it." FERRARI informed AMATO that FERRARI must lay low and look legitimate. FERRARI agreed, saying, "yeah, I gotta lay extra low, and I'm gonna be deliberate on the real phone talking about how legitimate I am…"

83.    On or about January 14, 2021, law enforcement intercepted a text message exchange between FERRARI and AMATO. FERRARI advised AMATO that FERRARI sold an individual a list of 20 gamblers to allow the individual to manage those gamblers' online sports bets. FERRARI needed AMATO to set this individual up with an account on the sports gambling website that FERRARI and AMATO use. FERRARI stated the new user would manage 20 gamblers' accounts, allowing each gambler to place bets for amounts ranging from $10 to $300 per bet and each gambler's account would start off with 500 credits (only allowing the gamblers to place $500 worth of bets). FERRARI advised AMATO that FERRARI did not need to monitor the new individual's account, FERRARI just needed to know what the individual owed FERRARI. AMATO advised FERRARI that AMATO could provide FERRARI with a report each month detailing what FERRARI was owed or create a report for FERRARI. AMATO ultimately informed FERRARI that AMATO created a "master account" for the new individual. AMATO also created a "sub-agent" account for the individual as well, so the individual could expand with additional gamblers. AMATO provided FERRARI with the login information and passwords for both accounts. FERRARI asked AMATO what the website was because "some guys can't use Sport 700." AMATO replied, "Sure we have other sites same backend standby", "Lions44.com", "Race46.com", "Blue 2050.com."

### F. Execution of a Search Warrant on the Website Sport700.com

84.     On or about January 2, 2021, New York State Supreme Court Justice Honorable Victoria M. Argento signed a warrant authorizing law enforcement to log into FERRARI's account on sport700.com using usernames and passwords that were known to belong to FERRARI.

85.     On or about January 3, 2021, law enforcement officers executed the search warrant by logging into FERRARI's account on sport700.com using FERRARI's username and password.

86.     A review of FERRARI's account indicated that it was created on or about April 25, 2019.

87.     According to the account records, as of January 3, 2021, FERRARI had 16 sub-agents.  Collectively, those 16 sub-agents managed 221 individual bettor accounts.

88.     According to the account records, throughout the lifetime of FERRARI's account (beginning on April 25, 2019, through January 3, 2021) FERRARI generated $1,241,172 in winnings.

89.     On or about February 6, 2021, New York State Supreme Court Justice Honorable Victoria M. Argento signed a warrant authorizing law enforcement to log into AMATO's account on sport700.com using a username and password that were known to belong to AMATO.

90.     On or about February 8, 2021, law enforcement officers executed the search warrant by logging into AMATO's account on sport700.com using AMATO's username and password.

91.     According to account records, AMATO's account was created on April 25, 2016.  AMATO had 128 sub-agent accounts operating underneath his account.  Collectively, these sub-agents managed 1,789 individual bettors.

92.     Throughout the lifetime of AMATO's account (beginning on April 25, 2016 through January 3, 2021) AMATO's winnings totaled $8,945,629.

93.     The registrant organization for the website domain www.sport700.com is Rica Digital Assets Limitada in San Jose, Costa Rica.

### G. *Review of Bank Records and Evidence of Money Laundering*

94.     According to records provided by Canandaigua National Bank ("CNB"), which is a banking institution insured by the FDIC, SPRAGUE is the sole signatory on account ending 3464 in the name of SSQ of NY Corp.  On or about February 9, 2021, SPRAGUE wrote a check from account 3464 to the landlord of 565 Blossom Road in the amount of $2,500.

95.     According to records obtained from Cash App, SPRAGUE, SESSA, and CIVILETTI all have Cash App accounts.  The transactions in these accounts are consistent with the payment and receipt of gambling wins and losses.  A number of transactions are between SPRAGUE and CIVILETTI and individuals who have been identified as bettors through the course of this investigation.

96.     As is set forth above, FERRARI and SPRAGUE directed bettors to pay the majority of their gambling losses in cash.  On multiple occasions, FERRARI directed bettors to bring cash payments to his business office, Ferrari Excavating, located at 45 Steel Street.

97.     During the timeframe in question, Ferrari Excavating banked with CNB.  An analysis of bank accounts controlled by FERRARI from April 2019 through January 2021 showed that FERRARI made relatively few cash transactions (deposits and/or withdrawals).

98.     However, according to a witness who is familiar with the books and records of Ferrari Excavating (hereinafter "Witness 1"), during that time frame, many of Ferrari Excavating's employees were paid "off-the-books" in cash.  Witness 1 stated FERRARI would provide WITNESS 1 with envelopes of cash every week with employees' names on them and WITNESS 1 would, in turn, provide these envelopes to the employees on pay day.

99.     In addition to paying employees in cash, Witness 1 stated that FERRARI would sometimes pay Ferrari Excavating's subcontractors in cash.  Witness 1 offered an example of landscapers doing work on one of the excavating jobs, and then they would come to the office where FERRARI would have an envelope of cash waiting for them to be paid for their work.

100.    Witness 1 acknowledged that on occasion FERRARI would tell WITNESS 1 someone was going to stop by the office and provide WITNESS 1 with an envelope of cash. Witness 1 claimed to not know the reason WITNESS 1 was collecting envelopes of cash, but understood it was not for business purposes (not business sales).

101.    Witness 1 stated and banking records confirm that Ferrari Excavating did not generate a lot of cash as revenue.  Witness 1 said that occasionally customers may have paid cash for small purchases, but routine business revenue was received by checks.

102.    Other employees of Ferrari Excavating were interviewed during the course of this investigation.  Several of these employees acknowledged being paid in cash or knowing of others being paid in cash while working at Ferrari Excavating.

103.    Based on Ferrari Excavating's payroll records and the information provided by the employees, it appears that $765,908 was paid to employees in cash, off-the-books from April 2019 through January 2021.  Ferrari Excavating generated cash revenue of only $97,232.36 during that same time.

104.    As such, based on my training and experience, my knowledge of this case, and my conversations with other members of law enforcement, I believe that the remaining $668,675.64 that FERRARI paid his employees in cash during that timeframe came directly from illegal gambling proceeds, *i.e.*, SUA proceeds.

105.    Since FERRARI was able to use SUA proceeds to pay employee compensation, he did not have to use the equal amount of legitimate business proceeds for payroll expenses.  Therefore, in using SUA proceeds to pay numerous employees with envelopes full of cash, FERRARI was substituting legitimate business revenue with illegal gambling proceeds.  FERRARI then paid the legitimate business revenue to himself.

### H. Execution of Search Warrant at 565 Blossom Road

106.    On or about April 16, 2021, New York State Supreme Court Justice Honorable Victoria M. Argento signed a warrant authorizing law enforcement to search 565 Blossom Road, Suite B, Rochester, NY 14610.

107.    On or about April 17, 2021, law enforcement executed the search warrant.

108.    When law enforcement agents executed the search warrant at 565 Blossom Road, they interrupted an ongoing illegal card game.  Upon entry, male and female individuals were observed fleeing towards the rear of the suite.  An unknown number of individuals successfully fled, eight were temporarily detained.

109.    The suite had gaming tables in the center, televisions, and lounge furniture around the outside, an office, and a kitchen, as shown below:

 

110. According to one of the individuals who was interviewed at the scene, SESSSA had been at the location managing the games, but fled when law enforcement arrived.

111. Law enforcement seized, *inter alia*, 16 televisions, three poker/gaming tables, gambling chips containing the Ferrari logo, miscellaneous documents, U.S. currency, a gold bar, and SESSA's personal belongings.

112. Among the documents discovered were gambling ledgers and timestamped website printouts of online gambling player account activities, as shown below:

 

113. Some of the ledgers detailed the amount of money brought in on a given evening from gambling, minus expenses for things like food, tips, and gambling payouts.

#### I.  *Review of Electronic Devices Seized From Searched Premises*

114.    On or about April 16, 2021, New York State Supreme Court Justice Honorable Victoria M. Argento signed a warrant authorizing law enforcement to search FERRARI's Mercedes GL5 and any electronic devices that were found therein.

115.    On or about April 17, 2021, law enforcement seized an Apple iPhone 12 from the center console of FERRARI's Mercedes GL5.  The iPhone belonged to LOUIS P. FERRARI II and was previously identified in this affidavit as PHONE 1.  A review of the contents of PHONE 1 revealed evidence of sports bookmaking.  In the Apple Notes application in the phone, a note titled "Dom Louie" created on 11/21/2020 and last edited on 11/29/2020 stated:

> Dom Louie
> Louie paid back 4200
> Louie paid coach 400
> Louie coll [UCO's sport700.com website login name] 475 (Tomaso)
> Louie coll 100 FedEx guy
> Louis paid blossom rent 2900
> Louie coll 4940 from back
>
> Dom paid blossom club 2000
>
> Louie coll 100 FedEx

116.    Based on my knowledge of this investigation, I believe that the note "Louie coll [UCO's sport700.com website login name] 475 (Tomaso)" refers to FERRARI collecting $475 in gambling losses from the UCO *via* SESSA, which is described in Paragraph 40, above.

117.    Another Apple Note discovered in FERRARI's PHONE 1 titled "Dom Louie 2" created 12/9/2020 and last edited 12/29/2020 stated:

Dom Louie 2
Louie coll 2450 [REDACTED]
Louie coll 530 coach
Louie pay [UCO's sport700.com website login name] 1360
Louie pay soccer [REDACTED] 2200
Louie coll 5760 bacc joe
Louie coll 4500 [REDACTED] soccer

Jim Dom coll 1500 [UCO's sport700.com website login name]

Louie pay directtv and spectrum Stacy has bills

Dom coll back joe cash ($?)

Louie coll coach joe 1200
Louie pay soccer 6000

118.    Based on my knowledge of this investigation, I believe that the note "Louie pay [UCO's sport700.com website login name] 1360" refers to FERRARI paying $1,360 in gambling winnings to the UCO for bets placed by the UCO on FERRARI's sport700.com website, as described in Paragraph 41, above.

119.    Based on my knowledge of this investigation, I believe that the note "Jim Dom coll 1500 [UCO's sport700.com website login name]" refers to when CIVILETTI collected $1,500 in gambling losses from the UCO at SPRAGUE's pawn shop as described in Paragraph 42, above.

120.    Further review of PHONE 1 revealed internet browsing history indicating the phone was utilized to access the sport700.com website on multiple occasions.  PHONE 1 also contained screenshot images of wagers placed on the sport700.com website and games available to bet on.  PHONE 1 also contained photos of bookmaking ledgers and videos of individuals gambling inside of 565 Blossom Road.

121.    On or about April 16, 2021, New York State Supreme Court Justice Honorable Victoria M. Argento signed a warrant authorizing law enforcement to search SPRAGUE's person and any electronic devices that were found on his person.

122.    On or about April 18, 2021, law enforcement seized an iPhone belonging to and in the possession of SPRAGUE (hereinafter "PHONE 3").

123.    A review of the contents of PHONE 3 revealed evidence of sports bookmaking. A review of the internet browsing history in PHONE 3 revealed numerous visits to the website sport700.com beginning in November 2020 and ending in April 2021.

124.    A review of the Apple Notes revealed the following note titled "Poker," created on 3/1/2021 and modified 4/12/2021.

> Poker
>
> 2/6 rough and tumble
> 2/13 $904paid $904
> 2/20 $1,725 Tommaso paid $24 Blackjack +195
> 2/27 $1191 poker
> 3/6 $1034 paid $1034 /Blackjack $190
>
> Wild 3/6 -476
> Wild 3/6 +100
> Facts 3/7 +248
> Wild 3/12 +480
> Facts 3/12 -73
>
> Lee 3/1 -1100
> [UCO's sport700.com login name] 2/2021 -3300
> Casino blackjack-4550
> Rent 2/2021 -2500
> Coach 3/4 +800 cash app
> Coach 3/13 +1000
> Rent 3/2021 -2500
> Lee 3/13 +30
> 3/14 poker + 1689

3/14 blackjack +4030
Wild 3/19 +350
Lee 3/20 +300
Wild 3/26 +150
Coach 3/27 +972 Venmo
Poker 3/28 +2865
Blackjack 3/28 -5110
Lee 3/29 +850
Rent 4/1 -2500
Sox 4/1 +3000
Blackjack 4/1 +100
Coach 4/2 +1200 cash app
Lee 4/6 +800 zelle
Wild 4/9 +475
Blackjack +1590
Mech BlackJack  -6000
Demon Blackjack -1500
Zelle for blackjack +300
Venmo+  450 Blackjack from mike
Blackjack +300 zelle from lee
Lee for blackjack -1320
Mike from blackjack-1550

125.    Based on my knowledge of this investigation, I believe that the note "[UCO's sport700.com login name] 2/2021 -3300" refers to when SPRAGUE paid $3,300 in gambling winnings to the UCO, as described in Paragraph 44, above.

126.    Also discovered in PHONE 3 were PDF files titled "BLOSSOMLOUIE" and "BUY IN."  The PDF document titled BLOSSOMLOUIE was a spreadsheet that kept track of gambling markers and gambling location expenses such as food and beverage costs, employee costs, and rent.  The PDF document titled BUY IN was a spreadsheet that kept track of what players were buying into games for and of gambling markers that had been paid.

127.    PHONE 3 also contained photos of bookmaking ledgers and other evidence of bookmaking.  There were also pictures in the phone of the poker chips used at 565 Blossom Road, which contained the FERRARI logo and the phrase Aces High.  PHONE 3 also

contained pictures of the inside of 565 Blossom Road and several advertisements for poker games taking place at that location.

128. The text messages between SPRAGUE and FERRARI that were in PHONE 3 discussed the day-to-day operation of 565 Blossom Road and the expenses associated with that operation.

129. The text messages discovered in PHONE 3 between SPRAGUE and SESSA include extensive discussions regarding the day-to-day operation of 565 Blossom Road and the payment of money to and collection of money from players for gambling wins and losses.

## <u>CONCLUSION</u>

130. Based on the foregoing, I respectfully submit probable cause exists to believe that:

    a. LOUIS P. FERRARI II violated Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Section 1084 (Transmission of Wagering Information); Title 18, United States Code, Section 1955 (Operation of an Illegal Gambling Business); and Title 18, United States Code, Section 1956 (Money Laundering);

    b. DOMINIC SPRAGUE violated Title 18, United States Code, Section 371 (Conspiracy); Title 18, United States Code, Section 1084 (Transmission of Wagering Information); and Title 18, United States Code, Section 1955 (Operation of an Illegal Gambling Business);

c. ANTHONY AMATO conspired to violate Title 18, United States Code, Section 1084 (Transmission of Wagering Information), in violation of Title 18, United States Code, Section 371 (Conspiracy);

d. JOSEPH LOMBARDO conspired to violate Title 18, United States Code, Section 1084 (Transmission of Wagering Information), in violation of Title 18, United States Code, Section 371 (Conspiracy);

e. JEFFREY BOSCARINO conspired to violate Title 18, United States Code, Section 1084 (Transmission of Wagering Information), in violation of Title 18, United States Code, Section 371 (Conspiracy); and

f. JAMES CIVILETTI conspired to violate Title 18, United States Code, Section 1084 (Transmission of Wagering Information), in violation of Title 18, United States Code, Section 371 (Conspiracy); and

g.      TOMASSO SESSA conspired to violate Title 18, United States Code, Section 1955 (Operation of an Illegal Gambling Business), in violation of Title 18, United States Code, Section 371 (Conspiracy).

MARILYN K HALLIDAY
Digitally signed by MARILYN K HALLIDAY
Date: 2023.02.14 16:20:57 -05'00'

MARILYN K. HALLIDAY
Special Agent
Homeland Security Investigations

Affidavit submitted electronically by email in .pdf format. Oath administered, and contents and signature attested to me as true and accurate telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on February 15 , 2023.

HON. MARK W. PEDERSEN
United States Magistrate Judge

46